IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| SHARONLEE SMITH *et al.*, | * |
| Plaintiffs | * |
| v. | * |
| GIANT FOOD, LLC, *et al.*, | * |
| Defendants | * |

\* \* \* \* \* \* \* \* \* \* \* \*

CIVIL NO.  JKB-12-3097

## MEMORANDUM

### I. Background

Sharonlee Smith ("Smith") and her husband, Bernard Smith (collectively, "Plaintiffs"),

filed suit in Baltimore County (Maryland) Circuit Court against Giant Food, LLC ("Giant"), and

two Giant employees, Mike Haines and Jerry Gans (collectively, "Defendants"), claiming false

imprisonment, intentional infliction of emotional distress, civil conspiracy, and loss of

consortium for conduct occurring on December 12, 2010, in Giant's Putty Hill Plaza store in

Baltimore County.  (Compl., ECF No. 2.)  Defendants removed to this Court on the asserted

basis of federal preemption under Section 301 of the Labor Management Relations Act of 1947

("LMRA"), codified at 29 U.S.C. § 185.  (ECF No. 1.)  Pending before the Court are

Defendants' motion to dismiss (ECF No. 11) and Plaintiffs' motion to remand to state court

(ECF No. 16).  Both motions have been briefed (ECF Nos. 17, 21, 22, 29, 30) and are ready for

decision.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2011).  Plaintiffs' motion to

remand will be granted, and Defendants' motion to dismiss will be denied as moot.

## II. Factual Allegations[1]

Smith began working at Giant's Putty Hill Plaza store in April 1996. (Compl. ¶ 12, ECF No. 2.) In December 2010, she primarily worked as a cashier, but on December 12, 2010, Smith filled in for a coworker as the salad bar leader. (*Id.* ¶¶ 13, 14.) About two hours after she began her shift that day, Smith noticed an object lying on the salad bar that appeared to her to be a hypodermic syringe. (*Id.* ¶¶ 15, 16.) She picked it up with a napkin and showed it to a coworker and, together, they showed it to a departmental manager, who instructed Smith to show it to an assistant manager, who, in turn, told Smith to show it to the pharmacist. (*Id.* ¶¶ 17-19.) The pharmacist was not sure what the object was and suggested the police be called. (*Id.* ¶ 20.) Officers from Baltimore County Police Department came to the store, looked at the object, and declared it to be an ink pen; they then left the store. (*Id.* ¶ 21.)

Gans and Haines[2] were employed by Giant as investigators or security personnel. (*Id.* ¶ 6.) Shortly before the end of Smith's shift, Gans and Haines approached her and told her to meet them in a small front office of the store after she clocked out. (*Id.* ¶ 22.) Although Gans and Haines did not tell Smith the purpose of the meeting, Smith believed they were going to ask her some questions about the events occurring earlier in the day. (*Id.* ¶¶ 24, 25.) Gans and Haines accompanied Smith into the office, where the assistant manager was also present. (¶¶ 25, 26.) The office was small, had only one door, had no windows, and was closed off from the rest of the store. (*Id.* ¶ 27.) Haines told Smith to sit down. (*Id.* ¶ 28.) Over the next two-and-a-half hours, Gans and Haines repeatedly told her they had video surveillance footage showing Smith putting the pen on the salad bar—but refused to show her the video—and threatened her with

---

[1] For the purpose of evaluating the motion to remand, the Court accepts as true all factual allegations in the complaint. All citations in this regard are to the complaint.

[2] Misidentified in the complaint as "Gaines" and "Hanes." The docket has been amended to reflect these defendants' correct names. (Notice of Removal 2 n.1, ECF No. 1.)

being charged with a felony and paraded through the store under arrest in handcuffs unless she confessed to putting the pen on the salad bar. (*Id.* ¶¶ 29-33, 35, 52.) Smith denied she had put the pen on the salad bar. (*Id.* ¶ 51.) She became distraught and cried, and she was terrified about what Gans and Haines were threatening to do to her. (*Id.* ¶¶ 38-40.) After roughly forty-five minutes, during which Gans and Haines remained between Smith and the door, they were unable to get her confession but told her to write down that she was confused as to whether she had placed the ink pen on the salad bar. (*Id.* ¶¶ 36, 41.) Haines dictated what Smith was to say and Smith wrote it down verbatim. (*Id.* ¶¶ 42, 43.) He handed the paper to the assistant manager who refused to sign it because it coerced. (*Id.* ¶¶ 44, 45.) Gans, Haines, and the assistant manager then left the office, closing the door behind them. (*Id.* ¶ 46.)

Smith was afraid to leave the office because of the previous threats by Gans and Haines that Smith would be arrested, handcuffed, paraded through the store in front of her coworkers, and charged with a felony. (*Id.* ¶ 47.) Shortly, Gans, Haines, and the assistant manager returned to the office, where Haines tore up the previously dictated statement and said they were all going to forget the statement had ever been created. (*Id.* ¶ 48.) Gans and Haines told Smith to write in her own words her admission that she placed the pen on the salad bar and they assured her nothing bad would happen to her. (*Id.* ¶ 50.) Smith maintained that she did not place the pen on the salad bar, but after two-and-a-half hours, she was terrified, humiliated, and crying, and she just wanted to get away from Gans and Haines without being handcuffed and charged with a crime. (*Id.* ¶¶ 51, 52.) Finally, at their prompting, Smith wrote that Gans and Haines saw her place the pen on the salad bar but that she had no recollection of doing so. (*Id.* ¶ 53.) Smith wrote the statement and signed it only because she was told that, unless she did so, she would not be allowed to leave the office except in handcuffs. (*Id.* ¶ 54.)

Gans, Haines, and the assistant manager left the office and the assistant manager returned in a few minutes and told Smith she was suspended from employment. (*Id.* ¶¶ 55, 56.) Smith then left the store. The next day, the store manager telephoned Smith and told her she was fired. (*Id.* ¶ 62.) Smith's union investigated her termination and negotiated her reinstatement on February 14, 2011. (*Id.* ¶¶ 63, 64, 75.) Smith suffered physical and mental distress brought on by the incidents of December 2010. (*Id.* ¶¶ 65-69.)

### III. Standard for Remand

Because federal courts are courts of limited jurisdiction, a cause of action is presumed to lie outside of that limited jurisdiction, and the burden of establishing otherwise rests upon the party asserting jurisdiction. *Barbour v. Int'l Union*, 640 F.3d 599, 605 (4th Cir. 2011) (en banc), *abrogated on other grounds by* 28 U.S.C. § 1446(b)(2)(B). In particular, removal statutes are to be strictly construed, and doubts regarding the propriety of removal should be resolved in favor of remanding the case to state court. *Id.*

### IV. Preemption under Section 301

It is well established that a state law cause of action may in certain circumstances be completely preempted by § 301 of the LMRA. If so, then § 301 provides the exclusive cause of action, and the course of the litigation is governed by § 301 and the law interpreting it. *See Avco Corp. Aero Lodge No. 735, Int'l Ass'n of Machinists*, 390 U.S. 557, 560 (1968); *Lontz v. Tharp*, 413 F.3d 435, 440-42 (4th Cir. 2005). The question that must be decided is whether Plaintiffs' claimed causes of action, arising under Maryland state law, are in fact preempted by § 301. After review of considerable case authority, the Court concludes the claims are not preempted.

Section 301 preempts any cause of action for the violation of a collective bargaining agreement ("CBA"). *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104-05 (1962). Section 301's

4

preemptive effect also extends beyond suits alleging violation of CBAs to suits relating to what the parties of a labor agreement agreed and what legal consequences were intended to flow from breaches of that agreement, whether those issues arise in a breach-of-contract suit or a suit alleging liability in tort. *Allis-Chalmers v. Lueck*, 471 U.S. 202, 210-11 (1985). Thus, "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Id.* at 220. However, "§ 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 409 (1988). State-law claims that have no relation to a CBA—other than the fact they are asserted by an employee covered by a CBA—are not preempted by § 301. *Caterpillar v. Williams*, 482 U.S. 386, 396 n.10 (1987) (citing *Franchise Tax Board v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 25 n.28 (1983), for proposition that state battery suit emanating from violent strike would not be preempted by § 301 simply because strike might have been in violation of employer-union contract). *See also Lingle*, 486 U.S. at 412-13 (observing that mere fact CBA provides contractual remedy for discriminatory or retaliatory discharge for conduct coincidentally violative of state law does not preempt state-law claim under state's antidiscrimination laws). Further, Section 301 "does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Lueck*, 471 U.S. at 212. Finally, the presence of a federal question, including a § 301 question, in a

5

defensive argument does not confer federal jurisdiction on a cause of action and, consequently, does not permit preemption of a state-law claim or removal of it to federal court. *Caterpillar*, 482 U.S. at 398-99 ("When a plaintiff invokes a right created by a collective-bargaining agreement, the plaintiff has *chosen* to plead what we have held must be regarded as a federal claim, and removal is at the defendant's option. But a *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated.").

Against those broad principles, Defendants assert that Plaintiffs' claims of false imprisonment and IIED are "substantially dependent on the Court's analysis of the CBA concerning Defendants' rights, obligations, and authority to conduct an investigation into Plaintiff's on-the-job misconduct, including the manner in which that workplace investigation took place." (Defs.' Opp'n 1, ECF No. 22.)   Under Maryland law, the elements of false imprisonment are "'a deprivation of the liberty of another without his consent and without legal justification.'"   *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 112 (Md. 2000) (citations omitted).   A claim of IIED has four elements:   (1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe. *Id.* at 113.  To flesh out Defendants' position, they implicitly and necessarily argue that whether their detention of Smith is justified and whether their conduct otherwise—as alleged by Smith, in detaining her, threatening her with felony arrest, and insisting she write and sign a confession before allowing her to leave the store other than in handcuffs—was outrageous requires the Court to interpret the CBA. The Court disagrees.

Defendants have cited various cases but careful analysis of them requires the conclusion that they do not support Defendants' argument.   They cite an unpublished Fourth Circuit

decision that is of doubtful precedential value given that it has never been cited by any subsequent Fourth Circuit case. *LePore v. Ramsey*, 946 F.2d 885 (4th Cir. 1991). *LePore* implies that a prior Fourth Circuit decision approved blanket preemption of IIED cases involving an employer and an employee who are governed by a CBA. *Id.* at *2. If that is *LePore*'s holding, then it would seem to be an overstatement of the published, *en banc* decision on which it relies. That earlier case is *McCormick v. AT&T Techs.*, 934 F.2d 531 (4th Cir. 1991). In *McCormick*, the Court concluded that the plaintiff's claims including IIED were preempted by § 301. *Id.* at 533. But it only reached that conclusion after analyzing the particular circumstances before the Court. In *McCormick*, the conduct at issue was an employer's cleaning out a work locker formerly assigned to a discharged employee. As the Court noted,

> Cleaning out a locker is not a matter of intrinsic moral import but a question of legal authority—whether management had the lawful right to proceed as it did. The rightness or wrongness of the action has not been committed to the common law of tort, but to the legal arrangements embodied in a contractual agreement, in this case through collective bargaining.

*Id.* at 536.

Whether conduct is "a matter of intrinsic moral import," as opposed to whether the wrongfulness of conduct can only be analyzed by interpreting a CBA, appears to be the touchstone for analysis of preemption claims. With the exception of *LePore*, this is the focus of Fourth Circuit cases involving § 301 preemption claims.

In *Alvey v. Ball Corp.*, 162 F. App'x 267 (4th Cir. Jan. 20, 2006) (unpublished), the conduct at issue was the employer's search of employer-owned work lockers for illegal substances, and the Court found that, although the CBA lacked any specific reference to locker searches, employees' claims of invasion of privacy and infliction of emotional distress were nevertheless preempted because interpretation of the CBA is not limited to its express provisions but also includes implied rights of reasonable performance and the duty to act in good faith. *Id.*

at 270. Notably, the Court found no clear state-law rule pertaining to locker searches and could only ascertain the wrongfulness *vel non* of those searches in relation to the parties' rights and duties under the CBA. *Id.* at 271. *See also Clark v. Newport News Shipbuilding & Dry Dock Co.*, 937 F.2d 934, 937-38 4th Cir. 1991) (noting that employee's discharge following positive test for illegal drugs could not be decided by reference to state law, given absence therefrom of "state law or public policy regarding drug testing standards or procedures in the private employment sector that create rights or obligations beyond those which can be the subject of a private agreement"; rather, CBA must be consulted to judge wrongfulness of discharge, which mandated preemption of state-law claim).

In *Harless v. CSX Hotels*, 389 F.3d 444 (4th Cir. 2004), the Court affirmed the remand of plaintiff's state-law claims for wrongful discharge, wrongful death, outrageous and unconscionable conduct, and IIED, noting that "the LMRA does not preempt intentional infliction of emotional distress claims that allege the distress was caused by discriminatory conduct that could not be condoned by a CBA." *Id.* at 449. Thus, in *Harless*, the claims turned on the employer's motivation for discharging the plaintiff, a question of fact not dependent on interpretation of a CBA, and whether that motivation violated state antidiscrimination laws. *Id.* *See also Owen v. Carpenters' Dist. Council*, 161 F.3d 767, 775 (4th Cir. 1998) (claim of wrongful discharge in violation of state's public policy held not preempted because conduct at issue was employer's motivation for discharge and whether it was in retaliation for report of sexual harassment; fact that "just cause" provision of CBA may be referred to in course of resolution of state-law claim does not require preemption). Likewise, the case of *Jackson v. Kimel*, 992 F.2d 1318 (4th Cir. 1993), involving an IIED claim following a former supervisor's coercion of the employee to engage in a sexual relationship, noted that reference to the CBA was unnecessary to determine whether the supervisor's conduct was extreme and outrageous. *Id.* at

1326. "His conduct, if it occurred as alleged, is wrongful regardless of whether it was authorized by the collective bargaining agreement." *Id.* The conduct in issue would not be wrongful because of a duty of care created or defined by the CBA, but because of principles of state tort law. *Id.* at 1326-27 (citing with approval *Hanks v. General Motors Corp.*, 906 F.2d 341, 344 (8th Cir. 1990), where court did not find preemption for several reasons, one of which was "because the claims involved duties owed by the employer 'to every member of society, not just to employees covered by the collective bargaining agreement.'")

In *Foy v. Giant Food*, 298 F.3d 284 (4th Cir. 2002), the gravamen of the plaintiff's complaint was that the employer had acted wrongfully in terminating him and refusing to reinstate him after criminal charges of assault against the plaintiff for allegedly grabbing and pushing another employee were dropped. As the Court noted, the employer's conduct was not wrong in the abstract and the only way to resolve whether the conduct at issue was wrongful was to refer to the CBA. *Id.* at 288. In another case, *Shiflett v. I.T.O. Corp.*, 202 F.3d 260 (4th Cir. 2000) (unpublished), the employee's supervisor witnessed conduct by the employee that could be regarded as theft of the employer's property and reported it to police, resulting in the employee's arrest. The employee's claims, including for false arrest and imprisonment, were held preempted by § 301. *Id.* at *7. The Court concluded that each of the plaintiff's claims rested on a common "element of wrongfulness that goes to the manner and nature of ITO's conduct in light of the information that it had at the time of the alleged wrong." *Id.* at *4. Thus, since ITO's conduct in investigating and reporting an apparent crime to the police was not a matter of intrinsic moral import, it was necessary to determine the employer's authority and responsibilities as to its employees under the CBA, and the plaintiff's claims were, consequently, preempted. *Id.* at *5.

An additional case preceded *McCormick*, but it also supports the proposition that state-law claims should be examined to determine whether the conduct at issue was contemplated by the CBA or whether the conduct was of intrinsic moral import. *Willis v. Reynolds Metals Co.*, 840 F.2d 254, 254-55 (4th Cir. 1988) (concluding that employer's meeting with employee and accusing her of disciplinary infraction were acts merely in exercise of employer's rights to control conditions in workplace). That distinction favors Plaintiffs in the instant case.

Maryland tort law and criminal law both proscribe false imprisonment. *See Manikhi*, 758 A.2d at 112 (elements of tort); *Lamb v. State*, 613 A.2d 402, 425 (Md. Ct. Spec. App. 1992) (false imprisonment is common law misdemeanor defined as unlawful detention of person against his will). Thus, Maryland law clearly reflects a public policy against physical detention of an individual without legal justification and makes the conduct a matter of intrinsic moral import. It is not even remotely possible to construe the CBA to which Smith and Giant were parties as permitting Giant to physically detain an employee against her will as an act of "investigation." And any claim by Giant that the CBA legitimizes its detention of Smith flies in the face of the Supreme Court's pronouncement in *Lueck* that § 301 "does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law." 471 U.S. at 212.

Further, the claim of IIED is premised upon the alleged false imprisonment and the alleged coercive, threatening statements by Gans and Haines during the course of the alleged imprisonment that, unless Smith confessed to what they accused her of doing, they would have her arrested on a felony charge, handcuffed, and paraded through the store in front of her coworkers. Giant has not set forth a plausible basis for arrest of Smith on a felony charge, and the Court cannot imagine what felony was committed even presuming Smith put the ink pen on

the salad bar.  If all that had been alleged was that Giant employees met with Smith and accused her of wrongdoing, then this case would be indistinguishable from *Willis*.  But Smith's allegations detail much more than a simple meeting and accusation of wrongdoing.  They recite a course of conduct that goes beyond mere "investigation" and crosses over into matters of intrinsic moral import under Maryland law.

## V. Conclusion

The Court concludes that neither the claim of false imprisonment nor the claim of intentional infliction of emotional distress is preempted by § 301.[3]  Consequently, this Court lacks subject-matter jurisdiction over the case, which will be remanded to Maryland's state courts.  Defendants' motion to dismiss shall be denied as moot, without prejudice to Defendants' rights to raise appropriate grounds therein in the state court proceeding.  A separate order will issue.

DATED this 20 day of March, 2013.

BY THE COURT:

James K. Bredar
United States District Judge

---

[3] The parties agree that Plaintiffs' claims of civil conspiracy and loss of consortium are merely derivative of either the alleged false imprisonment or the IIED, or both.  If Smith's claims had been preempted, these derivative claims would have been preempted as well.  (Defs.' Opp'n Mot. Remand 8 n.4, ECF No. 22; Pls.' Reply 12, ECF No. 30.)